IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:25cr366-MHT |
| | ) | (WO) |
| KENTARIUS CHRISTOPHER | ) | |
| STEPHENS | ) | |

OPINION

Defendant Kentarius Christopher Stephens pleaded
guilty to possession of a firearm by someone convicted
of a felony in violation of 18 U.S.C. § 922(g)(1) and
§ 924(e).   In calculating his Guidelines range, the
United States Probation Officer identified an enhanced
base offense level of 20, which, under United States
Sentencing Guideline 2K2.1(a)(4)(B), applies if, as is
relevant in this case, the instant offense involved a
weapon that contained a magazine capable of holding
more than 15 bullets (a "high-capacity firearm").  *See*
U.S.  Sent'g  Guidelines  (U.S.S.G.)  § 2K2.1(a)(4)(B).
Stephens did not object to the probation officer's
calculations but sought a downward variance from the
resulting custody range for several reasons.  The court

granted a variance for the reasons set forth at the sentencing hearing and detailed below.[1]

## I. BACKGROUND

After Stephens pleaded guilty, the probation officer correctly applied Guideline 2K2.1(a)(4), which establishes a base offense level of 20 (rather than 14) when, in relevant part, the gun the defendant possessed is a "semiautomatic firearm that is capable of accepting a large capacity magazine" and the "defendant ... was a prohibited person at the time [he] committed the instant offense." U.S.S.G. § 2K2.1(a)(4)(B). The Commission defines a "'semiautomatic firearm that is capable of accepting a large capacity magazine' [as] a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense ... the firearm had attached to it a magazine or similar device

---

1. The court overlooked issuing this opinion directly after it sentenced Stephens in November 2025.

that could accept more than 15 rounds of ammunition."
U.S.S.G. § 2K2.1, cmt. n.2 (2025).   It is undisputed
that the firearm underlying Stephens's conviction could
accept 17 rounds of ammunition, and thus qualifies as a
high-capacity firearm under this Guideline.   *See* Def.'s
Sent'g Mem. (Doc. 41) at 6.   Without a variance, a base
offense level of 20 combined with Stephens's
criminal-history category of II yielded a recommended
custody range of 37 to 46 months.

## II. LEGAL STANDARD

A sentencing court has considerable discretion in
determining an appropriate sentence, but the sentence
must be reasonable.   *See United States v. Irey*, 612
F.3d 1160, 1188–89 (11th Cir. 2010).   In determining a
defendant's sentence, courts must consider the
recommended sentence under the Sentencing Guidelines
and any relevant policy statements.   *See* 18 U.S.C.
§ 3553(a); *see also United States v. Booker*, 543 U.S.
220, 259-60 (2005).   However, the Guidelines are only

3

"one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Specifically, courts must also consider the factors listed in 18 U.S.C. § 3553(a).[2] While Guidelines sentences generally should approximate the § 3553(a) factors, trial courts may, in the course of an individual sentencing, determine that "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply" or that "the Guidelines sentence itself fails properly to reflect

---

2. These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need to afford adequate deterrence and protect the public from further crimes of the defendant; the need to provide, in the most effective manner, needed educational or vocational training, medical care, or other correctional treatment to the defendant; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the kinds of sentences available. *See* 18 U.S.C. § 3553(a).

§ 3553(a) considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007).

## III. DISCUSSION

Here, such circumstances apply. Specifically, Guideline 2K2.1(a)(4) "unfairly sweeps in a wide range of dissimilar conduct." *United States v. Franklin*, No. 2:22cr107-MHT, 2022 WL 16921811 at *1 (M.D. Ala. Nov. 14, 2022) (Thompson, J.). And, when a Guideline "unfairly groups" unlike behavior, the court may use a variance to "calibrate" the relevant enhancement based on the conduct of a particular defendant. *United States v. Conway*, No. 2:19cr61-MHT, 2019 WL 7161326 at *3 (M.D. Ala. Dec. 23, 2019) (Thompson, J.). The court will first discuss how varying downward in cases such as this one--where a court believes a Guideline's application is unfair--is a necessary aspect of a sentencing court's role in the evolution of the Guidelines, then will turn to the history of the high-capacity firearm enhancement, and finally the

court will discuss why it varied downward in Stephens's case.


A.  The Sentencing Court's Role in the Guidelines'
Evolutionary Process

The Guidelines and cases interpreting them explicitly contemplate their evolutionary nature and the role that sentencing courts play in this process. In the original introduction to the Guidelines, the Commission "emphasize[d]" that the development of a sentencing system based on guidelines is an evolutionary one.[3] U.S.S.G. § 1A1.2 (1987). The Commission later added substantial commentary on the

---

3.  The Commission further noted that, "It expects, and the governing statute anticipates, that continuing research, experience, and analysis will result in modifications and revisions to the guidelines through submission of amendments to Congress. To this end, the Commission is established as a permanent agency to monitor sentencing practices in the federal courts." U.S.S.G. § 1A1.2 (1987).

"continuing evolution" of the Guidelines.[4] *See* U.S.S.G., app. C, Am. 651 (2003).

Moreover, the Supreme Court has plainly discussed the Guidelines' identity as a work in progress, noting in *Rita* that:

> "The Commission's work is ongoing. The statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and courts of appeals in that process. The sentencing courts, applying the Guidelines in individual cases, may depart ( ... , since *Booker*, by imposing a non-Guidelines sentence). The judges will set forth their reasons. The Courts of Appeals will determine the reasonableness of the resulting sentence. The Commission will collect and examine the results. In doing so, it may obtain advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in

---

4. For example, the Commission highlighted that, among other things, The Sentencing Reform Act of 1984 "empowered the Commission with ongoing responsibilities to monitor the guidelines, submit to Congress appropriate modifications of the guidelines and recommended changes in criminal statutes, and establish education and research programs. The mandate rested on congressional awareness that sentencing is a dynamic field that requires continuing review by an expert body to revise sentencing policies, in light of application experience." U.S.S.G., app. C, Am. 717 (2011).

penology, and others. And it can revise the Guidelines accordingly."[5]

*Rita*, 551 U.S. at 350; *see also Booker*, 543 U.S. at 264

("[T]he Sentencing Commission remains in place, writing

Guidelines, collecting information about actual

district court sentencing decisions, undertaking

---

5.   Justice Breyer--who oversaw the development of the Sentencing Guidelines as an original member of the United States Sentencing Commission--offered even more support for this view later in *Rita*:

> "By articulating reasons, even if brief, the sentencing judge not only assures reviewing courts (and the public) that the sentencing process is a reasoned process *but also helps that process evolve*. The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court. That being so, his reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors, can provide relevant information to both the court of appeals and ultimately the Sentencing Commission. The reasoned responses of these latter institutions to the sentencing judge's explanation should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw."

*Rita v. United States*, 551 U.S. 338, 357-58 (2007) (emphasis added).

research, and revising the Guidelines accordingly."); *Gall v. United States*, 552 U.S. 38, 46 (2007) (noting, as the Court stated in *Rita*, that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"); *Mistretta v. United States*, 488 U.S. 361, 369–79 (1989) ("[T]he [Commission's] monitoring function is not without its burden. Every year, with respect to each of more than 40,000 sentences, the federal courts must forward, and the Commission must review, the presentence report, the guideline worksheets, the tribunal's sentencing statement, and any written plea agreement.").  The Court makes it clear that the courts' sentencing decisions lay the foundation for the Commission's continuous mandate to reconsider the Guidelines.

The Commission has also pointed to the Sentencing Reform Act's provisions that "promote and facilitate

this evolutionary process."[6] U.S.S.G., app. B, Pt. II, § 2 (2025). Taken together, the Sentencing Reform Act, Guidelines' commentary, Commission's practices, and Supreme Court's descriptions of our sentencing system highlight the role of the courts in the continually evolving U.S. Sentencing Guidelines. When courts such as this one sentence outside the Guidelines range (that is, above or below), they are in dialogue with the Commission on this ongoing project toward a more just and effective sentencing regime. Thus, courts disserve this evolutionary system when they decide not to vary even though they should because they see that a

---

6. "For example, pursuant to 28 U.S.C. § 994(x), the Commission publishes guideline amendment proposals in the *Federal Register* and conducts hearings to solicit input on those proposals from experts and other members of the public. Pursuant to 28 U.S.C. § 994(o), the Commission periodically reviews and revises the guidelines in consideration of comments it receives from [criminal justice system stakeholders], and in consideration of data it receives from sentencing courts and other sources. Statutory mechanisms such as these bolster the Commission's ability to take into account fully the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) in its promulgation of the guidelines." U.S.S.G., app. B, Pt. II, § 2 (2025).

Guideline is inadequate.  In other words, a court that plays it safe by not varying actually undermines our Guidelines system.

B.   The High-Capacity Firearm Enhancement

Because Guideline 2K2.1(a)(4) "yield[s] an identical base offense level for defendants whose underlying actions differ dramatically," *Franklin*, 2022 WL 16921811 at *1, it is "inconsistent with § 3553(a), prizing uniformity over individualized consideration of the circumstances of the offense and the defendant's history, characteristics, and behavior,"[7] *Conway*, 2019 WL 7161326 at *3.  For instance, defendants' base offense levels would increase from 14 to 20 whether they possessed--for the same nine-millimeter Glock

---

7.   For example, "a defendant's base offense level might increase from 14 to 20 if his or her previous conviction entails, among other things, robbery, arson, 'forcible sex offenses,' or murder. Or ... in [someone else's] case, possession of less than one ounce of marijuana." *United States v. Robinson*, No. 2:21cr48-MHT, 2021 WL 3373784 at *2 (M.D. Ala. Aug. 3, 2021) (Thompson, J.) (citation omitted).

pistol involved in this offense--a common, factory-equipped, *17-round magazine*,[8] a Glock *33-round magazine* (the largest that Glock produces for this pistol),[9] or a third-party manufactured *50-round magazine* (which costs less than $ 100).[10] Thus, the enhancement tends to group pistols of varying magazine-capacity and thus lethality. Looking beyond semiautomatic *pistols*, this enhancement would also apply to a defendant who possessed a significantly more powerful AR-15 semiautomatic *rifle* equipped with a factory-standard 30-round magazine.[11]

---

8. *See* Def.'s Sent. Mem. (Doc. 41) at 6 (depicting the listing for the type of weapon used by Stephens which is marketed as a gun that is "perfect for recreational shooting enthusiasts of all levels").

9. *See* https://us.glock.com/en/products/commercial-firearms/G4 .

10. *See* https://themagshack.com/shop/pistol-magazines/9mm/promag-glock-17-19-9mm-50-round-drum-magazine/.

11. *See* https://ruger.com/products/ar556/specSheets/8500.html.

Further, the history of this six-level base offense-level enhancement for possession of a high-capacity firearm highlights a lack of empirical foundation and detailed public process normally present in developing Guidelines Amendments. As this court stated in *United States v. English*, 333 F.Supp.3d 1311 (M.D. Ala. 2018) (Thompson, J.), the enhancement in Guideline 2K2.1 for semiautomatic firearms was adopted at the direction of Congress pursuant to the Violent Crime Control and Law Enforcement Act of 1994. Among other provisions, that Act introduced a national "assault weapons ban," which banned semiautomatic assault weapons, and high-capacity magazines, such as the 17-round magazine that Stephens had inserted in his gun. In response, the Sentencing Commission amended the enhancement in Guideline 2K2.1(a)(4)(B)--which already applied to sawed-off shotguns, silencers, machine guns, bombs, grenades, rockets, and poison gas

13

devices, *see* 26 U.S.C. § 5845(a), (f)--to include the semiautomatic weapons banned by the Act.[12]

Congress allowed the assault-weapons ban to lapse on September 13, 2004.  Prior to its sunset, Congress commissioned a study conducted after the enactment of the ban, which made findings that appear to undermine the rationale for the ban.  *See* Jeffrey A. Roth et al., Urban Institute, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*, at 2 (Mar. 1997).

Despite Congress's repeal of the ban, and the findings of its study in support of that repeal, the Sentencing Commission in 2006 decided to retain the Guideline 2K2.1 enhancement for semiautomatic weapons, and in fact expanded its definition into its current form to encompass far more guns than the semiautomatic assault weapons banned by the Act.  The only reason

---

12.  However, the amended enhancement would not have applied to Stephens because the gun he possessed underlying this conviction does not meet the definition of semiautomatic assault weapon under the Act.

14

given by the Commission for the 2006 Amendment was "inconsistent application" of the enhancement "in light of the ban's expiration."   U.S.S.G., app. C, Am. 691 (2006).   The Commission never addressed whether the enhancement for semiautomatic firearms should continue to apply or continue to apply to the same degree after Congress had repealed the Act under which it was initially adopted, or considering the findings in the congressional study.

This history casts some doubt on whether, in light of the original reason for the semiautomatic weapons enhancement and Congress's subsequent actions, it continues to be reasonable for courts to apply a six-level enhancement to defendants for possessing such weapons, which are now legal to possess for people without felony convictions.   Regardless, as detailed above, it is certainly within this court's power to vary downward to reach a reasonable sentence.

C.  Application of These Principles in Stephens's Case

Here, the Guidelines yield an identical base offense level for defendants whose underlying actions differ dramatically.  Guideline 2K2.1(a)(4)(B) "thus is inconsistent with § 3553(a), prizing uniformity over individualized consideration of the circumstances of the offense and the defendant's history, characteristics, and behavior."  *Conway*, 2019 WL 7161326 at *3.  In such a circumstance, "an outside the guideline sentence may not be optional; it may well be essential to prevent both unwarranted disparity and unwarranted uniformity."  *United States v. Whigham*, 754 F. Supp. 2d 239, 252 (D. Mass. 2010) (Gertner, J.); *see also Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment) ("Fairness requires sentencing uniformity as well as efforts to recognize relevant sentencing differences.").  To avoid such unwarranted uniformity--and based on the circumstances of Stephens's possession of a magazine two bullets larger

16

than the threshold triggering Guideline 2K2.1(a)(4)(B) (unlike other high-capacity semiautomatic weapons swept up in this Guideline)--the court varied downward by three levels, landing in the middle of the difference between the correctly applied base offense level and the base offense level Stephens would have had if his gun contained a magazine capable of holding two fewer bullets.

The court believes that the three-level enhancement remaining after the downward variance still accounts for the danger posed by high-capacity firearms "that ha[ve] the ability to fire many rounds without reloading," U.S.S.G. § 2K2.1, cmt. n.2 (2025), while fairly calibrating the enhancement to avoid unwarranted uniformity.  *Cf.* U.S.S.G. app. B, § 5K2.17[13] (laying out

---

13. Although the policy statement contained in Guideline 5K2.17 no longer appears in the 2025 Guidelines Manual, this is not because the Commission disapproved of the content, but rather because the Commission recognized courts used the policy statements to guide decisions about variances rather than departures.  *See* U.S.S.G. app. C, Am. 836 (2025) ("It is the Commission's intent that judges who would have

the policy statement for upward departures when high-capacity firearms are used in connection with crimes of violence or controlled substance offenses: "The extent of any increase should depend upon the degree to which the nature of the weapon increased the likelihood of death or injury in the circumstances of the particular case"). The base offense level thereby decreased from 20 to 17. That change, combined with the U.S. Probation Officer's further calculations, resulted in a Guidelines range of 37 to 46 months.

The court then varied downward by an additional two levels to 'calibrate' Stephens's culpability for the in-connection enhancement pursuant to Guideline 2K2.1(b)(6)(B). This enhancement applies if the defendant "possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). It is undisputed that Stephens

---

relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts, or any other relevant factors, to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a).").

possessed 80.4 grams of marijuana, a digital scale, and plastic baggies when law enforcement agents discovered his possession of a firearm as a prohibited person, triggering this four-level enhancement.[14]  Stephens did not object to the application of the enhancement but requested a two-level downward variance to 'calibrate' his culpability to the quantity of drugs he possessed. This enhancement unfairly groups Stephens with defendants who possess great quantities of illegal narcotics or commit violent felonies in connection with their illegal possession of a firearm.  It yields an identical four-level enhancement for defendants whose underlying actions differ dramatically.  And it thus is inconsistent with § 3553(a), prizing uniformity over individualized consideration of the circumstances of the offense and the defendant's history, characteristics, and behavior.  Here, to avoid such unwarranted uniformity, the court varied downward by

---

14.   Possession of marijuana for a reason other than for personal use is a felony under Alabama law. 2024 Ala. Crim. Code § 13A-12-213(a)(1).

19

two levels to ensure that this enhancement accurately reflects the court's individualized consideration of the circumstances underlying Stephens's offense.

Finally, the court varied downward by an additional two levels to account for both Stephens's documented "adverse childhood experiences" (that is, ACEs) and the role his associated mental-health conditions played in his offense conduct--in recognition of the former Guideline 5H1.1 policy statement[15]--yielding a range of 24 to 30 months.  This two-level reduction is a modest mitigation to account for these significant and relevant contextual circumstances.  The court sentenced Stephens at the top of this final range.

DONE, this the 6th day of August, 2026.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

---

15. Now found in U.S.S.G. app. B, § 5H1.1 (2025); *see also* footnote 13.